UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE GRAND JURY PROCEEDINGS

Misc. Action Nos. 98-095,
98-096 & 98-097 (NHJ)

**FILED**

**REDACTED VERSION** MAY 2 7 1998

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

**MEMORANDUM OPINION**

Before this Court are the Independent Counsel's motions to compel three witnesses to comply with their grand jury subpoenas. Witnesses Bruce Lindsey and Sidney Blumenthal have refused to answer certain questions propounded to them before the grand jury on the basis of executive privilege and Lindsey has refused to answer certain questions based upon the [REDACTED], governmental attorney-client privilege, and governmental work product protection. The attorney for the White House represented to the Court at a hearing on this matter that there were no questions as to which the third witness, [REDACTED], would assert the executive privilege or the attorney-client privilege. The Court will therefore deny the Independent Counsel's motion to compel [REDACTED] testimony as moot.

With respect to the remaining witnesses, the Court will first address their mutual claim of executive privilege. [REDACTED] Lastly, the Court will consider Lindsey's claim of governmental attorney-client privilege and work product protection.

**I. Analysis**

A. *Executive Privilege*

The OIC has moved to compel the testimony of Lindsey and Blumenthal, two of President Clinton's senior advisers. The President has asserted that the executive privilege, also known as the presidential communications privilege, protects conversations involving himself,

33

Lindsey and Blumenthal, and top White House aides. The presidential communications privilege

is a governmental privilege intended to promote candid communications between the President

and his advisors concerning the exercise of his Article II duties. United States v. Nixon, 418

U.S. 683, 705, 708, 711 (1974); In re Sealed Case, 121 F.3d 729, 744 (D.C. Cir. 1997) (the "Espy

case"). This Circuit has recognized a "great public interest" in preserving "the confidentiality of

conversations that take place in the President's performance of his official duties" because such

confidentiality is necessary in order to protect "the effectiveness of the executive

decision-making process." Nixon v. Sirica, 487 F.2d 700, 717 (D.C. Cir. 1973); In re Sealed

Case, 121 F.3d at 742. Courts have recognized that the President "occupies a unique position in

the constitutional scheme," Nixon v. Fitzgerald, 457 U.S. 731, 749 (1982), and that "[i]n no case

of this kind would a court be required to proceed against the president as against an ordinary

individual." Nixon, 418 U.S. at 708 (quoting United States v. Burr, 25 F.Cas. 187, 192 (No.

14,694) (C.C.D.Va. 1807)).

### 1. The Presumption of Privilege

The White House argues that the communications of Lindsey and Blumenthal are

presumptively privileged because President Clinton has invoked executive privilege. The OIC

counters that the communications are not privileged because the executive privilege applies only

to communications regarding official presidential matters and the federal grand jury investigation

regarding Monica Lewinsky and the Paula Jones litigation are private matters. In light of the

holdings of the United States Supreme Court and the Court of Appeals for the District of

Columbia Circuit, this Court finds that it has a duty to treat the subpoenaed testimony of Lindsey

and Blumenthal as presumptively privileged. See Nixon, 418 U.S. at 713; In re Sealed Case, 121

2

F.3d at 743.

Prompted by the Watergate investigation, the Supreme Court held that when the President of the United States asserts a claim of executive privilege, the district court has a "duty to . . . treat the subpoenaed material as presumptively privileged." Nixon, 418 U.S. at 713 (emphasis added). The D.C. Circuit recently reiterated this holding when it considered President Clinton's assertion of the executive privilege in the context of a federal grand jury investigation of Michael Espy, former Secretary of Agriculture. In re Sealed Case, 121 F.3d at 743. The D.C. Circuit wrote: "The President can invoke the privilege when asked to produce documents or other materials that reflect presidential decision-making and deliberations and that the President believes should remain confidential. If the President does so, the documents become presumptively privileged." Id. at 744. In the Espy case, the D.C. Circuit treated the executive communications at issue as presumptively privileged just as it had done in earlier cases involving President Nixon's assertions of executive privilege. Id. at 743; see Sirica, 487 F.2d at 717; Senate Select Comm. on Presidential Campaign Activities v. Nixon, 498 F.2d 725, 730 (1974) ("Presidential conversations are 'presumptively privileged,' even from the limited intrusion represented by in camera examination of the conversations by a Court."). The presumptive privilege for executive communications "embodies a strong presumption, and not merely a lip-service reference." Dellums v. Powell, 561 F.2d 242, 246 (D.C. Cir.), cert. denied, 434 U.S. 880 (1977).

No court has ever declined to treat executive communications as presumptively privileged on the grounds that the matters discussed involved private conduct. In fact, in the Nixon cases, the D.C. Circuit and the Supreme Court treated President Nixon's executive

3

communications with his aides as presumptively privileged even though they involved the

President's alleged criminal involvement in a break-in at the Democratic National Committee

headquarters and its subsequent cover-up. See Nixon, 418 U.S. at 708; Sirica, 487 F.2d at 717;

Senate Select, 498 F.2d at 730. In Senate Select, the subpoena explicitly directed President

Nixon to give Congress taped conversations between himself and John Dean that "discuss[ed]

alleged criminal acts occurring in connection with the Presidential election of 1972." 498 F.2d at

727. The D.C. Circuit not only presumed that the conversations were privileged, but also stated

that the showing of need required to overcome the presumption "turned, not on the nature of the

presidential conduct that the subpoenaed material might reveal, but instead, on the nature and

appropriateness of the function in the performance of which the material was sought, and the

degree to which the material was necessary to its fulfillment." Id. at 730. In other words, the

nature of the presidential conduct at issue, whether it was official or private, appeared not to

affect the presumption of privilege or the need stage of the D.C. Circuit's executive privilege

analysis.

Purely private conversations that did not touch on any aspect of the President's official

duties or relate in some manner to presidential decision-making would not properly fall within

the executive privilege.[1]  However, the President does need to address personal matters in the

context of his official decisions.  The position that nothing the President or his advisors could say

---

[1] See, e.g., Nixon v. Administrator of General Services, 433 U.S. 425, 449 (1977) (noting
that the privilege is "limited to communications 'in performance of [a President's]
responsibilities,' 'of his office,' and made 'in the process of shaping policies and making
decisions'"); In re Sealed Case, 121 F.3d at 752 ("Of course, the privilege only applies to
communications that these advisers and their staff author or solicit and receive in the course of
performing their function of advising the President on official government matters.").

4

to each other regarding the grand jury investigation or the <u>Jones</u> litigation would relate to the

President's official duties is oversimplified.  Indeed, the Independent Counsel has conceded that

certain executive communications, such as those discussing how the President should respond to

the Lewinsky matter during Tony Blair's visit, are protected by the executive privilege.  3/20/98

Tr. at 61-62.

At this stage, the Court has no evidence that Lindsey and Blumenthal's conversations

discussing the Lewinsky and Jones matters were not related in some way to official decision-

making.  To the contrary, the Court has [REDACTED] sworn affidavits asserting that the

conversations at issue involved official matters such as possible impeachment proceedings,

domestic and foreign policy matters, and assertions of official privileges.[2]  The Office of the

President submitted the affidavits "to establish as a factual matter that the communications in the

White House over which executive privilege was being asserted related to official matters and

official conduct."  3/20/98 Tr. at 43.  The grand jury transcripts provided to the Court do not

indicate that the witnesses refused to answer questions regarding conversations that did not relate

to the President's official duties.  The Court will not speculate that conversations among the

President and his advisors fell outside of the President's Article II responsibilities.

The Court does not have documents or tapes to review <u>in camera</u> that could establish

whether the content of the subpoenaed communications relates only to private matters, nor does

it know how Lindsey and Blumenthal might answer the grand jury's questions.  The Court is

aware of only the unanswered questions themselves.  Furthermore, unlike the Espy case, the

---

[2]  Declaration of Charles F.C. Ruff at ¶¶ 19-28; [REDACTED].

5

subpoenas here call for testimony, not documents that the Court could review in camera. The

Court's ability to assess whether the subpoenaed materials relate to official decisions is thus

greatly hindered. This Circuit has stated:

> [A]ny court completely in the dark as to what Presidential files contain is duty
> bound to respect "the singularly unique role under Art. II of a President's
> communications and activities, related to the performance of duties under that
> Article." For "a President's communications and activities encompass a vastly
> wider range of sensitive material than would be true of any 'ordinary individual,'"
> and "(i)t is therefore necessary in the public interest to afford Presidential
> confidentiality the greatest protection consistent with the fair administration of
> justice." . . . . [T]here is a presumption of privilege which can only be overcome
> by some demonstration of need.

United States v. Haldeman, 559 F.2d 31, 76 (D.C. Cir. 1976) (footnotes omitted), cert. denied

sub. nom Ehrlichman v. United States, 431 U.S. 933 (1977).

Under Nixon, the Court has a duty to treat the subpoenaed testimony as presumptively

privileged. 418 U.S. at 713. In light of this binding precedent, the factual similarities between

the Nixon cases and the case at hand, and the evidence submitted with respect to the President's

invocation of privilege, this Court finds that it must treat the communications of Lindsey and

Blumenthal as presumptively privileged.

### 2. The Scope of the Privilege

Although the Court must presume that presidential communications are privileged, the

scope of the privilege is limited to "communications authored or solicited and received by those

members of an immediate White House adviser's staff who have broad and significant

responsibility for investigating and formulating the advice to be given to the President on the

particular matter to which the communications relate." In re Sealed Case, 121 F.3d at 752. In

other words, the President does not have to participate personally in the communication in order

6

for it to be privileged.

Citing the presidential communications privilege, Lindsey refused to answer questions before the grand jury regarding a conversation he had with [REDACTED].  The White House did not mention [REDACTED] in its brief or at the hearings before this Court, much less argue that [REDACTED] is a presidential adviser.  At any rate, the White House has not met its burden of showing that [REDACTED] communications with Lindsey "occurred in conjunction with the process of advising the President."  Id.  Accordingly, the Court finds that any conversations between Lindsey and [REDACTED] are not covered by the executive privilege.

Both Lindsey and Blumenthal refused to answer questions before the grand jury regarding conversations they had with the First Lady, citing executive privilege.  [REDACTED] states: "The First Lady functions as a senior adviser to the President, and it was in that capacity that I had discussions with her about the Independent Counsel's investigation."  [REDACTED]  At the hearing on this matter, in response to a question from the Court, the attorney for the White House argued that First Ladies have traditionally held a position of senior adviser to the President and cited Association of American Physicians & Surgeons, Inc. v. Clinton, 997 F.2d 898 (D.C. Cir. 1993).  The OIC has not contested that Mrs. Clinton would be covered by the executive privilege.

In Association of American Physicians & Surgeons, the D.C. Circuit faced the question of whether Mrs. Clinton was an "officer or employee of the government" for purposes of the Federal Advisory Committee Act ("FACA").  Id. at 902.  Mrs. Clinton chaired the President's Task Force on National Health Care Reform ("Task Force"), which was to advise the President and make recommendations to him.  The issue before the D.C. Circuit was whether the Task Force qualified for an exemption from FACA as an advisory group whose members were all

officers and employees of the government.  Rather than decide the constitutional question of whether the application of FACA would unconstitutionally interfere with the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art II, § 3, the court decided that Mrs. Clinton was an officer or employee of the government under FACA.  997 F.2d at 911.  In the D.C. Circuit's discussion of the constitutional question, the court stated: "This Article II right to confidential communications attaches not only to direct communications with the President, but also to discussions between his senior advisers. . . .  [I]f the President seeks advice from those closest to him, whether in or out of government, the President's spouse, typically, would be regarded as among those closest advisers."  Id. at 909-10.

Mrs. Clinton is widely seen as an advisor to the President and "Congress itself has recognized that the President's spouse acts as the functional equivalent of an assistant to the President."  Id. at 904 (citing 3 U.S.C. § 105(e)).  The Court finds that conversations between the First Lady and Lindsey or Blumenthal fall under the executive privilege.

### 3. OIC's Showing of Need

The presumptive executive privilege is not absolute.  Sirica, 487 F.2d at 716.  The Court will not accept the President's "mere assertion of privilege as sufficient to overcome the need of the party subpoenaing the [testimony]."  Id. at 713.  The presumption of privilege may be rebutted by a sufficient showing of need by the Independent Counsel.[3]  In re Sealed Case, 121 F.3d 729, 754 (D.C. Cir. 1997).

In deciding what showing of need is sufficient to overcome an assertion of the executive

---

[3]  See Nixon, 418 U.S. at 713; In re Sealed Case, 121 F.3d at 742; Dellums, 561 F.2d at 249; Senate Select, 498 F.2d at 730.

privilege, the D.C. Circuit looked to the need analyses established in the cases involving

President Nixon and the Watergate investigation. Id. at 753.[4] The court found that these cases

"balanced the public interests served by protecting the President's confidentiality in a particular

context with those furthered by requiring disclosure." Id. Working from the Supreme Court's

rather vague requirement of a "demonstrated, specific need for evidence," Nixon, 418 U.S. at

713, the D.C. Circuit concluded that in order to overcome an assertion of executive privilege, the

OIC must show "first, that each discrete group of the subpoenaed materials likely contains

important evidence; and second that this evidence is not available with due diligence elsewhere."

In re Sealed Case, 121 F.3d at 754. These elements must be shown "with specificity." Id. at 756.

The information sought need not be "critical to an accurate judicial determination." Id. at 754.

The first requirement means that the evidence being sought must be "directly relevant to

the issues that are expected to be central to the trial." Id. The D.C. Circuit noted that this

requirement will not typically have much impact because Federal Rule of Criminal Procedure

17(c) already limits a subpoena to relevant information. With respect to the second requirement,

the party seeking to overcome the privilege should first attempt to determine whether sufficient

evidence could be obtained elsewhere. Id. at 755. The issuer of the subpoena "should be

prepared to detail these efforts and explain why evidence covered by the presidential privilege is

still needed." Id. The Court of Appeals has noted:

> there will be instances where such privileged evidence will be particularly useful,
> as when, unlike the situation here, an immediate White House advisor is being
> investigated for criminal behavior. In such situations, the subpoena proponent

---

[4] The D.C. Circuit examined the need analyses established in Nixon, 418 U.S. at 713; Sirica, 487 F.2d at 716; and Senate Select, 498 F.2d at 731.

> will be able easily to explain why there is no equivalent to evidence likely
> contained in the subpoenaed materials.

Id. The court also foresaw that "a grand jury will often be able to specify its need for withheld

evidence in reasonable detail based on information obtained from other sources." Id. at 757.

Finally, if the grand jury finds it difficult to obtain evidence from other sources, "this fact in and

of itself will go far toward satisfying the need requirement." Id.

If a "demonstrated, specific need" is shown, then the subpoenaed testimony shall be given

to the grand jury unless there is "no reasonable possibility that the category of materials the

Government seeks will produce information relevant to the general subject of the grand jury's

investigation." United States v. R. Enterprises, 498 U.S. 292, 300 (1991). "The question of what

evidence might reasonably be relevant to the grand jury's investigation should be answered by

reference to the reasons the grand jury gave in explaining its need for the subpoenaed materials."

In re Sealed Case, 121 F.3d at 759.

The Court ordered the OIC to make a showing of need and the OIC made an extensive ex

parte submission to the Court on that subject, which the Court has reviewed in camera. The

submission surveys a substantial portion of the evidence gathered by the grand jury during the

OIC's investigation to provide background for the OIC's explanation of why certain inquiries

must be directed to the White House and the President's closest advisers. The OIC attaches

portions of the grand jury testimony of Lindsey[5] and Blumenthal that highlight the questions they

declined to answer on the basis of executive privilege.

In general, Lindsey declined to answer questions relating to [REDACTED]. He also

---

[5] Upon the motion of Lindsey, the Court has reviewed the transcript of his complete
grand jury testimony as well.

declined to discuss [REDACTED]. Blumenthal declined to answer questions relating to

[REDACTED]. The submission delineates nineteen categories of information it seeks from

Lindsey and three categories of information it seeks from Blumenthal and describes how each

category meets the In re Sealed Case need standard.

Because the Court has reviewed the documents in camera, and most, if not all, of those

documents are protected by Federal Rule of Criminal Procedure 6(e)(2), its finding of need

cannot be detailed. See id. at 740. The Court cannot describe the categories of evidence needed

in any more detail than it has already because doing so would reveal "matters occurring before

the grand jury." See Federal Rule of Civil Procedure 6(e)(2). The Court finds that the categories

of testimony sought by the OIC from Lindsey and Blumenthal are all likely to contain relevant

evidence that is important to the grand jury's investigation. In re Sealed Case, 121 F.3d at 754.

The OIC has been authorized to investigate whether Monica Lewinsky "or others," including

President Clinton, suborned perjury, obstructed justice, or tampered with witnesses. Order of the

Special Division, Jan. 16, 1998. The testimony sought and withheld based on executive privilege

is likely to shed light on that inquiry, whether exculpatory or inculpatory. In re Sealed Case, 121

F.3d at 754.

In addition, [REDACTED]. If there were instructions from the President to obstruct

justice or efforts to suborn perjury, such actions likely took the form of conversations involving

the President's closest advisors, including Lindsey and Blumenthal. Additionally, if the

President disclosed to a senior adviser that he committed perjury, suborned perjury, or obstructed

justice, such a disclosure is not only unlikely to be recorded on paper, but it also would constitute

some of the most relevant and important evidence to the grand jury investigation. The D.C.

11

grand jury questions concerning his communications with the President, members of the White

House Counsel's Office, grand jury witnesses or their attorneys, and the President's personal

attorneys. The attorney-client privilege protects communications from clients to their attorneys

that were intended to be confidential and were made for the purpose of obtaining legal advice.

See Tax Analysts, 117 F.3d at 618. Communications from attorneys to their clients are also

protected if the communications "rest on confidential information obtained from the client." Id.

(citation omitted). Lindsey claims to have performed legal services as Deputy Counsel to the

President for his client, the Office of the President. He has "advis[ed] the Office of the President

on whether the President should assert his official privileges to protect the communications at

issue here from compelled disclosure, and gather[ed] the facts needed to reach a recommendation

on that question." White House's Mem. Concerning President Clinton's Suppl. Filing in Support

of Opp. to Mot. to Compel Testimony of Bruce Lindsey at 2. In addition, Lindsey has gathered

information including talking to grand jury witnesses or their attorneys in order to provide legal

advice to the Office of the President with respect to potential impeachment proceedings.

    Lindsey also asserts an absolute governmental attorney-client privilege with respect to

advice he rendered to the Office of the President on "how best to prevent other litigation in which

the President is involved from hampering the Presidency's fulfillment of its institutional duties."

Id. To the Court's knowledge, the only "other litigation in which the President is involved" is the

Paula Jones suit. Additionally, Lindsey asserts the governmental privilege with respect to his

communications with the President's personal attorneys pursuant to the common interest

doctrine. He claims that the Office of the President and the President as an individual share

certain common interests that permitted confidential communications between the Office of the

13

Circuit noted that if a crime being investigated by the grand jury relates to "the content of certain conversations," then the grand jury's need for the exact text of those conversations is "undeniable." Id. at 761 (quoting Senate Select, 498 U.S. at 732) (emphasis added).

The Court also finds that the OIC has met its burden of showing with specificity that the evidence is not available with due diligence elsewhere. See id. at 754. The OIC seeks testimony regarding conversations that took place within the White House and the only sources of that testimony are those persons participating in the conversations. Further, the OIC presented the Court with detailed information about its unsuccessful efforts to obtain this evidence through other sources. The OIC has diligently pursued other alternatives where feasible.[6] [REDACTED]

In sum, the OIC has provided a substantial factual showing to demonstrate its "specific need" for the testimony. Nixon, 418 U.S. at 713. The Court finds that the evidence covered by the presumptive privilege remains necessary to the grand jury and cannot feasibly be obtained elsewhere. The Court will grant the OIC's motions to compel the testimony of Lindsey and Blumenthal insofar as they have asserted executive privilege.

B. [REDACTED]

C. *Official Attorney-Client Privilege and Work Product Protection*

Lindsey has asserted an absolute governmental attorney-client privilege in response to

---

[6] The White House claims to have offered to permit non-attorney advisors such as Blumenthal to testify as to factual information in executive communications but refuses to permit them to disclose strategic deliberations. However, the White House fails to establish the parameters of factual and strategic matters and the Court finds it difficult to discern in advance whether communications are strategic or factual. For example, if directions were given to obstruct justice in some fashion, such directions could constitute a strategic decision but could also be characterized as a factual event. Not only was the White House offer ambiguous, but there is also some question as to whether it was a firm offer. Given the ambiguity of the offer, the Court declines to factor it into its decision.

White House Counsel and the President's personal attorneys. Lastly, Lindsey has asserted the governmental work product doctrine in response to questions regarding his interviews with grand jury witnesses and their counsel.

      1.     The Attorney-Client Privilege in the Federal Grand Jury Context

The White House asks the Court to recognize an absolute governmental attorney-client privilege in the context of a federal grand jury investigation of an official's alleged private misconduct. The OIC argues that no such privilege should exist in this context.

The Court begins by noting that privileges "are not lightly created nor expansively construed, for they are in derogation of the search for truth." Nixon, 418 U.S. at 710. Privileges should be recognized "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." Trammel v. United States, 445 U.S. 40, 50 (1980) (citations omitted). When deciding whether to recognize asserted privileges, courts are instructed by Federal Rule of Evidence 501 to interpret the common law privileges "in the light of reason and experience." Pursuant to Rule 501, this Court must determine whether the asserted privilege has any history of being applied under the circumstances here, and if not, whether applying such a privilege would serve some important public interest.

Only two Courts of Appeal have addressed the issue of whether a governmental attorney-client privilege can be asserted in response to a federal grand jury subpoena. The Sixth Circuit explained that it has assumed that a governmental attorney-client privilege exists but has "never explicitly so decided." Reed v. Baxter, 134 F.3d 351, 356 (6th Cir. 1998); In re Grand Jury Subpoena, 886 F.2d 135 (6th Cir. 1989). Neither Sixth Circuit case decided that a governmental

attorney-client privilege exists and neither case involved an investigation of a government

official's private conduct; both cases challenged official government conduct.

The Eighth Circuit case, by contrast, did involve a federal grand jury investigation of a

government official's private conduct and is the only Court of Appeals case that has actually

decided whether a governmental attorney-client privilege should exist in the federal grand jury

setting. In re Grand Jury Subpoena, 112 F.3d 910 (8th Cir.), cert. denied, 117 S. Ct. 2482. That

case involved a federal grand jury investigation of the private conduct of President and Hillary

Clinton in what is known as the Whitewater matter. See id. at 913. The White House received a

grand jury subpoena seeking "'[a]ll documents created during meetings attended by any attorney

from the Office of Counsel to the President and Hillary Rodham Clinton (regardless of whether

any other person was present)' pertaining to several Whitewater-related subjects." Id. The White

House refused to produce two sets of notes responsive to the subpoena, asserting a governmental

attorney-client privilege. Id. at 914. Both sets of notes were taken during meetings attended by

White House attorneys, Mrs. Clinton, and her personal attorneys. Id.

The Eighth Circuit required production of both sets of notes, concluding that even if a

governmental attorney-client privilege exists in other contexts, "the White House may not use the

privilege to withhold potentially relevant information from a federal grand jury." Id. at 915.

Pursuant to Federal Rule of Evidence 501, the court applied the federal common law of attorney-

client privilege to the facts and found that no governmental attorney-client privilege exists in the

context of a federal criminal investigation. Id. The Eighth Circuit was not persuaded that

Proposed Federal Rule of Evidence 503, which defines "client" to include public officers or

public organizations, or the few cases involving a governmental attorney-client privilege in fact

established such a privilege in the grand jury context. Id. at 916-17.  As a result, the Eighth

Circuit "turned to general principles" about privileges and the grand jury and decided not to

recognize such a privilege. Id. at 918, 919-21.

The majority rejected the dissent's decision to recognize a qualified governmental

attorney-client privilege that would be subject to the Nixon balancing test regarding executive

privilege, concluding that no governmental attorney-client privilege, not even a qualified one,

should exist in the federal grand jury context. In re Grand Jury Subpoena, 112 F.3d at 919.

Under the Nixon test, the grand jury's need for the subpoenaed material is balanced against the

White House's need for confidentiality.  418 U.S. at 712-13.  Executive communications, which

the Court discussed earlier, are presumed privileged unless the proponent of the subpoena can

overcome the presumption with a sufficient showing of specific need for the privileged material.

Id. at 713.  The dissenting judge in the Eighth Circuit case thought this analysis should apply to

the governmental attorney-client privilege to ensure that the President receives candid,

confidential legal advice that will be disclosed only if a federal grand jury truly needs it. In re

Grand Jury Subpoena, 112 F.3d at 926-27.  The majority did not find Nixon to be "directly

controlling" as it addressed a different privilege, but did find the case "indicative of the general

principle that the government's need for confidentiality may be subordinated to the needs of the

government's own criminal justice processes." Id. at 919.

2.    Applicability of the Governmental Attorney-Client Privilege

In seeking to compel Lindsey to testify, the OIC asks the Court to follow the majority

opinion in the Eighth Circuit case and find that no attorney-client privilege exists in the federal

grand jury context.  The White House urges this Court not to follow the Eighth Circuit case,

insisting that the majority's reasoning is flawed and that the D.C. Circuit clearly recognizes an absolute governmental attorney-client privilege. The White House argues that the attorney-client privilege is an absolute privilege and that it should therefore apply equally to civil and criminal matters regardless of whether a private or government party asserts the privilege.[7] The amicus brief of the Attorney General asks the Court to recognize a qualified privilege that would "balance the demands of criminal law enforcement against the asserted need for confidentiality [by the White House]." Brief Amicus Curiae for the United States, Acting Through the Attorney General at 7-8 ("Attorney General Amicus Brief"). While the Attorney General does not request a specific balancing test, she does suggest a standard of need similar to the one established in Nixon. See Brief Amicus Curiae for the United States, Acting Through the Attorney General, Supporting Certiorari, in In re Grand Jury Subpoena, 112 F.3d 910 (8th Cir.1997), at 15.[8]

In this Circuit, an absolute governmental attorney-client privilege does apply to FOIA cases and other civil cases in which government attorneys represent government agencies or employees against private litigants in matters involving official government conduct. D.C. Circuit FOIA cases,[9] Proposed Rule of Evidence 503, and the D.C. Bar's Rules of Professional

---

[7] The White House also seeks a qualified governmental attorney-client privilege in the alternative, if the Court rejects its arguments for an absolute privilege.

[8] The Amicus Brief filed in this matter incorporates the arguments made by the Attorney General in support of the petition for certiorari in In re Grand Jury Subpoena, 112 F.3d 910 (8th Cir.), cert. denied, 117 S.Ct. 2482 (1997).

[9] See, e.g., Tax Analysts, 117 F.3d at 618; Brinton v. Dep't of State, 636 F.2d 600, 603 (D.C. Cir. 1980); Mead Data Central v. Dep't of the Air Force, 566 F.2d 242, 252 (D.C. Cir. 1977).

Conduct[10] all recognize such a privilege.[11] In light of these authorities and the President's need for confidential legal advice, see Nixon, 418 U.S. at 708, the Court concludes that a governmental attorney-client privilege does apply in the federal grand jury context. In Nixon, the Supreme Court found that President Nixon's need for confidential advice from his advisers supported the existence of an executive privilege, acknowledging that "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." Id. This Court finds the President's need for confidential legal advice from the White House Counsel's Office to be as legitimate as his need for confidential political advice from his top advisers. This compelling need supports recognition of a governmental attorney-client privilege even in the context of a federal grand jury subpoena.

3.    The Scope of the Governmental Attorney-Client Privilege

Although the Court finds that a governmental attorney-client privilege should apply in the federal grand jury context, the Court is not willing to recognize an absolute privilege. Even though this privilege is absolute in civil cases, such as FOIA cases, this Court finds FOIA cases to be distinguishable from federal grand jury matters because the former involve civil litigation between the federal government and private parties seeking information from the government,

---

[10] See District of Columbia Rules of Professional Conduct, R. 1.13 & cmt. 7, 1.6 & cmts. 33-36.

[11] "Uniform Rule [of Evidence] 502 limits the governmental privilege to situations involving a pending investigation or litigation and requires a finding by the court that disclosure will 'seriously impair' the agency's pursuit of the investigation or litigation." In re Grand Jury Subpoena, 112 F.3d at 916 (citing Unif. R. Evid. 502(d)(6)).

whereas the latter involve criminal matters in which a government party seeks information from another government agency. In re Grand Jury Subpoena, 112 F.3d at 918-19. The Court agrees with the Eighth Circuit that the criminal/civil distinction is significant and that "[m]ore particularized rules may be necessary where one agency of government claims the privilege in resisting a demand for information by another." Id. at 916 (quoting Restatement (Third) of the Law Governing Lawyers § 124 cmt. b). In the context of a federal grand jury investigation where one government agency needs information from another to determine if a crime has been committed, the Court finds that the governmental attorney-client privilege must be qualified in order to balance the needs of the criminal justice system against the government agency's need for confidential legal advice.

The Supreme Court's reasons for recognizing a qualified and not absolute executive privilege in Nixon support this Court's conclusion that a qualified governmental attorney-client privilege should apply in the federal grand jury context. In Nixon, President Nixon claimed an absolute executive privilege in response to a trial subpoena for tapes and documents regarding his conversations with his staff and aides. 418 U.S. at 688-89. The Supreme Court held that only a qualified executive privilege should exist in the criminal trial context. Id. at 711-12 n.19. This Court agrees with the Supreme Court that "[t]he impediment that an absolute, unqualified privilege would place in the way of the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions would plainly conflict with the function of the courts under Art. III." Id. at 707. Although the D.C. Circuit recognizes an absolute government attorney-client privilege in FOIA cases and in other civil cases in which a government attorney represents a government agency or employee, the Court finds that this absolute privilege should not be

"expansively construed" to apply to a federal grand jury investigation for such a privilege would clearly be "in derogation of the search for truth." Id. at 710. The Court believes that a qualified governmental attorney-client privilege will permit federal grand juries to search for the truth about alleged crimes while simultaneously protecting the need of the White House for confidential legal communications.

The White House claims that candid legal advice will be chilled if the Court does not recognize an absolute governmental attorney-client privilege in the federal grand jury context. Similar arguments were rejected by the Supreme Court with respect to the assertions of executive privilege by President Nixon and with respect to a privilege asserted by state legislators comparable to that of members of Congress.[12]  Like the Supreme Court, this Court "cannot conclude that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution." Nixon, 418 U.S. at 712. The argument is also unpersuasive

---

[12] In United States v. Gillock, the Supreme Court rejected similar arguments:

> We recognize that denial of a privilege to a state legislator may have some minimal impact on the exercise of his legislative function; however, similar arguments made to support a claim of Executive privilege were found wanting in United States v. Nixon, when balanced against the need of enforcing federal criminal statutes. There, the genuine risk of inhibiting candor in the internal exchanges at the highest levels of the Executive Branch was held insufficient to justify denying judicial power to secure all relevant evidence in a criminal proceeding. Here, we believe that recognition of an evidentiary privilege for state legislators for their legislative acts would impair the legitimate interest of the Federal Government in enforcing its criminal statutes with only speculative benefit to the state legislative process.

445 U.S. 360, 373 (1980) (citations omitted).

for reasons articulated by the Eighth Circuit:

> Because agencies and entities of the government are not themselves subject to criminal liability, a government attorney is free to discuss anything with a government official — except for potential criminal wrongdoing by that official — without fearing later revelation of the conversation.  An official who fears he or she may have violated the criminal law and wishes to speak with an attorney in confidence should speak with a private attorney, not a government attorney.

In re Grand Jury Subpoena, 112 F.3d at 921.  Only a qualified governmental attorney-client privilege in the grand jury context can balance the President's need for frank legal advice against the grand jury's need for relevant evidence of criminal conduct.

Since the Nixon decision in 1974, the White House has operated effectively under a qualified executive privilege.  The President continues to receive candid political advice from his top aides and the Court has no doubt that the President will continue to receive sound legal advice from White House attorneys under a qualified governmental attorney-client privilege. The Court shares the belief of the D.C. Circuit that:

> So long as the presumption that the public interest favors confidentiality can be defeated only by a strong showing of need by another institution of government — a showing that the responsibilities of that institution cannot responsibly be fulfilled without access to records of the President's deliberations — we believed in Nixon v. Sirica, and continue to believe, that the effective functioning of the presidential office will not be impaired.

Senate Select, 498 F.2d at 730.  The Court is confident that "the President's broad interest in confidentiality of communications will not be vitiated by disclosure of a limited number of conversations preliminarily shown to have some bearing on the pending criminal cases." Nixon, 418 U.S. at 713.

The Court's decision to make the attorney-client privilege qualified like the executive privilege not only respects the needs of the criminal justice system, but also saves courts from

having to apply two different privilege standards to conversations commingling political and legal advice to the President. Many of the President's top advisers, such as Lindsey, provide both legal and political advice to the President and White House discussions often involve a mixture of the two. If no privilege applied to legal advice in the White House, as the OIC would have it, White House attorneys might be tempted to characterize their advice as political to acquire the qualified protection of the executive privilege. Similarly, if an absolute privilege applied to legal advice to the President while only a qualified executive privilege applied to political advice, the President and his staff might be tempted to characterize confidential political communications as legal in order to obtain greater protection. The Court finds that an absolute governmental attorney-client privilege would overly complicate communications to the President for both White House employees and the federal courts, that it would unduly frustrate the work of federal grand juries, and that it is not necessary to ensure candid legal advice to the President.

The White House argues that the attorney-client privilege has always been an absolute privilege and that it should not be qualified in the federal grand jury context. Although it is true that a private party may invoke an absolute attorney-client privilege in both civil and criminal matters, including federal grand jury investigations,[13] the Court finds that the differences between private and governmental organizations noted by the Eighth Circuit provide compelling reasons for qualifying the governmental attorney-client privilege in the context of a federal grand jury investigation. See In re Grand Jury Subpoena, 112 F.3d at 920. While the Eighth Circuit

---

[13] See, e.g., Hickman v. Taylor, 329 U.S. 495 (1947); In re Sealed Case, 124 F.3d 230 (D.C. Cir. 1997), cert. granted sub. nom Swidler & Berlin v. United States, 66 U.S.L.W. (U.S. Mar. 30, 1998) (No. 97-1192); In re Sealed Case, 107 F.3d 46 (D.C. Cir. 1997).

majority found these differences provided sufficient grounds for not recognizing any governmental attorney-client privilege in the federal grand jury context, this Court finds the differences support qualifying the privilege so that it may be overcome when a federal grand jury can show sufficient need for otherwise privileged material.

A private organization such as a corporation and a government institution such as the White House differ significantly, especially in the criminal context. First, as the Eighth Circuit pointed out, the conduct of White House personnel cannot subject the White House as a legal entity to criminal liability. Id. The alleged conduct of Ms. Lewinsky and President Clinton may subject them to criminal prosecution or impeachment respectively, but their conduct cannot implicate the White House in any criminal or civil litigation. As the Eighth Circuit pointed out, there is a difference between "official misconduct" and "misconduct by officials" and it is clear that "[t]he OIC's investigation can have no legal, factual, or even strategic effect on the White House as an institution." Id. at 923. The conduct of corporate employees, however, can expose a corporation to civil and criminal liability. Id. For this reason, corporate attorneys need an absolute privilege so that they can obtain candid information from corporate employees and provide competent legal advice to the corporation, as the Supreme Court fully recognized in Upjohn. 449 U.S. 383, 389-90 (1981). Given that no liability threatens the White House, its attorneys do not have as compelling a need to obtain full and candid information from the President regarding an investigation of his alleged private misconduct and thus do not need the protection of an absolute attorney-client privilege as much as private corporations do.

In fact, White House attorneys, like all other executive branch employees, have a statutory duty to report any criminal misconduct by other employees to the Attorney General.

See 28 U.S.C. § 535(b); In re Grand Jury Subpoena, 112 F.3d at 920.  Unlike a private attorney

representing a corporation, when a White House attorney learns that a White House employee

has engaged in criminal conduct, he must report such conduct.  A private attorney is under no

such obligation unless the conduct poses a threat of death, substantial bodily harm, or bribery of

witnesses, jurors, or court officials.  See D.C. Rules of Professional Conduct, Rule 1.6(c); Model

Rules of Professional Conduct, Rule 1.6(b).  The Eighth Circuit refused to recognize a

governmental attorney-client privilege in the context of a federal grand jury investigation in part

because such a privilege would conflict directly with the duty established by section 535(b).  In

re Grand Jury Subpoena, 112 F.3d at 920.  The White House challenges the Eighth Circuit's

reasoning, arguing that section 535(b) and memoranda interpreting it from the Justice

Department's Office of Legal Counsel[14] show no congressional intent to vitiate the attorney-

client privilege.  The Attorney General's amicus brief also asserts that section 535(b) must be

interpreted consistently with the governmental attorney-client privilege.  See Attorney General

Amicus Brief at 11.

Nothing in the language of the statute or its legislative history suggests a congressional

intent either to vitiate the privilege or to exempt government attorneys from the duty to report.

In re Grand Jury Subpoena, 112 F.3d at 932 (noting "the absence of any discussion of the subject

---

[14] See Antonin Scalia, Assistant Attorney General, Office of Legal Counsel,
Memorandum for the Deputy Attorney General re: Disclosure of Confidential Information
Received by U.S. Attorney in the Course of Representing a Federal Employee at 2 (Nov. 30,
1976); Ralph W. Tarr, Acting Assistant Attorney General, Office of Legal Counsel, Duty of
Government Lawyers Upon Receipt of Incriminating Information in the Course of an Attorney-
Client Relationship with Another Government Employee at 6 (March 29, 1985) (both cited in In
re Grand Jury Subpoena, 112 F.3d at 932 (Kopf, J., dissenting)).

in the legislative history") (citation omitted).  The Court acknowledges that the Justice Department has interpreted the section consistently with a governmental attorney-client privilege outside of the grand jury context.  Accordingly, the Court finds that section 535(b) neither precludes nor requires the recognition of a governmental attorney-client privilege in the federal grand jury context.  Rather, the Court finds that section 535(b)'s duty to report criminal activity provides further support for the Court's conclusion that the governmental attorney-client privilege should be qualified in the context of a federal grand jury investigation of an official's alleged misconduct.  Under a qualified privilege, government attorneys would be required to report privileged information regarding possible criminal activity, as section 535(b) requires, when a federal grand jury could demonstrate sufficient need for such information.

The Court's decision to qualify the governmental attorney-client privilege in the context of a federal grand jury investigation is also supported by the fact that White House attorneys, unlike private attorneys, work for the American public.  As the Eighth Circuit pointed out, "the general duty to public service calls upon government employees and agencies to favor disclosure over concealment."  Id. at 920.  The Supreme Court has found that the public responsibilities of accountants weighed against giving them work product immunity, see United States v. Arthur Young & Co., 465 U.S. 805, 817 (1984), and in refusing to recognize a governmental attorney-client privilege for White House attorneys, the Eighth Circuit recognized that White House attorneys bear far greater public responsibilities than private accountants.  In re Grand Jury Subpoena, 112 F.3d at 921.  This Court finds that the public responsibilities of White House attorneys weigh in favor of requiring them to divulge otherwise privileged information when a federal grand jury needs such information to determine whether a crime has been committed.

The Court believes that "the strong public interest in honest government and in exposing wrongdoing by public officials would be ill-served by recognition of a[n] [absolute] governmental attorney-client privilege in criminal proceedings inquiring into the actions of public officials." Id.

The Court shares the Eighth Circuit's belief that "to allow any part of the federal government to use its in-house attorneys as a shield against the production of information relevant to a federal criminal investigation would represent a gross misuse of public assets." Id. This is especially true given the large number of attorneys working for the federal government. See id. (recognizing the "pernicious potential of [a governmental attorney-client privilege] in a government top-heavy with lawyers") (citation omitted). White House attorneys are paid by U.S. taxpayers to provide legal advice on official presidential decisions, not the private decisions of President Clinton, and certainly not private, potentially criminal conduct. Members of the White House Counsel's office are not, and should not be, representing President Clinton in the grand jury investigation regarding Monica Lewinsky; the President's private attorneys have been hired to do this. The Eighth Circuit made this clear to the White House when it refused to recognize a governmental attorney-client privilege under very similar circumstances. Id. at 915. Since the issuance of the Eighth Circuit opinion in February 1997, the White House has been on notice that legal communications between the President and White House attorneys regarding federal grand jury investigations of the President or the First Lady's alleged private misconduct are not guaranteed absolute protection. Thus, if President Clinton had legal communications with White House attorneys regarding the grand jury investigation of the Monica Lewinsky matter, just as Hillary Clinton did in the Whitewater grand jury investigation, he did so "at [his] peril" because

26

both the majority and the dissent of the Eighth Circuit opinion made clear that such consultations

would no longer be absolutely protected.  Id. at 927 (Kopf, J., dissenting).[15]

4.      The Standard of Need

For all of the above reasons, the Court holds that the governmental attorney-client

privilege is qualified in the context of a federal grand jury investigation and that, like the

executive privilege, it can be overcome by a showing of need.  This Court must determine what

type of showing must be made to justify release to a federal grand jury of materials protected by

the governmental attorney-client privilege.  In the Espy case, the D.C. Circuit addressed the same

question with respect to the White House's assertion of the executive privilege in response to a

federal grand jury subpoena.  In re Sealed Case, 121 F.3d at 742.  As the Court discussed earlier,

the D.C. Circuit held that, in order to overcome the presumption of executive privilege, the OIC

must show two factors:  "first, that each discrete group of the subpoenaed materials likely

contains important evidence; and second that this evidence is not available with due diligence

---

[15] Judge Kopf, in dissent, concluded that the Nixon balancing test for executive privilege
should apply to the governmental attorney-client privilege and warned Mrs. Clinton that in the
future her communications with White House attorneys could be subject to disclosure.  He wrote:

> because we should now declare for the first time that Nixon overcomes the White
> House privilege if a proper showing is made, Mrs. Clinton would consult with
> White House lawyers at her peril in the future.  She would be informed from our
> opinion that such consultations might no longer be protected since the other party
> to her conversations (the White House and its lawyers) could be obligated to
> respond to a grand jury subpoena if the prosecutor made the showing required by
> Nixon.  Consequently, in the future, and to the extent of a grand jury subpoena,
> any such communications could not legally be "intended" by Mrs. Clinton as
> "confidential" under Rule 503(a)(4) because she would know and understand that
> her communications could be "disclosed to third persons."

Id. at 927 (emphasis added).

27

elsewhere." Id. at 754. The Court finds that the need analysis established by the D.C. Circuit in

the Espy case for assertions of the executive privilege in response to a federal grand jury

subpoena should also apply to assertions of the governmental attorney-client privilege in

response to a federal grand jury subpoena. The need analysis in the Espy case is more relevant

and appropriate than the need analysis established by the Supreme Court for trial subpoenas in

Nixon and properly weighs the President's need for confidential legal advice against the grand

jury's need for relevant and otherwise unavailable evidence. Id. at 755-57.

Although the Espy case involved the executive privilege, the Court finds that its two-

prong need analysis should apply to the government attorney-client privilege for many of the

same reasons articulated above in support of the Court's decision to make the governmental

attorney-client privilege qualified like the executive privilege in the context of a federal grand

jury investigation. The President's need for candid legal advice from the White House Counsel's

Office and his need for frank political advice from his top advisers are comparable needs that

require some degree of confidentiality. The grand jury's need for relevant evidence of crimes

applies equally whether the executive privilege or the governmental attorney-client privilege has

been asserted. Thus, the competing needs in both cases are similar and the need analysis

established by the D.C. Circuit in the Espy case provides a thoughtful balance of these needs. By

requiring the Special Prosecutor to show that "each discrete group of the subpoenaed materials

[or testimony] likely contains important evidence," the first prong of the need analysis ensures

"that the evidence sought must be directly relevant to issues that are expected to be central to the

trial." Id. at 754. This prevents the prosecutor from engaging in a fishing expedition and assures

the President and White House attorneys that their conversations will be protected unless they

directly relate to a central matter of a criminal investigation. The second prong, which requires the prosecutor to show that the subpoenaed evidence "is not available with due diligence elsewhere," provides further protection for the President's need for confidential legal advice. Id.

As the Court noted earlier, applying the same need analysis to the White House's assertions of both the executive privilege and the governmental attorney-client privilege has the added benefit of sparing federal courts from having to apply two different legal standards to conversations combining political and legal advice to the President and removes the incentive to characterize one form of advice as the other in order to obtain greater privilege protection. This is especially important in the White House context because advisers such as Lindsey regularly provide both forms of advice within a single conversation. The Court also notes that "[t]he factors of importance and unavailability are also used by courts in determining whether a sufficient showing of need has been demonstrated to overcome other qualified executive privileges, such as the deliberative process privilege or the law-enforcement investigatory privilege." Id. at 755 (citing In re Comptroller of the Currency, 967 F.2d 630, 634 (D.C. Cir. 1992); Friedman v. Bache Halsey Stuart Shields, Inc., 738 F.2d 1336, 1342 (D.C. Cir. 1984)). The Court finds no support for devising a different balancing test of the competing needs of the grand jury and the White House, especially given the similarities between the Espy case and the case at hand.

For all of the reasons articulated above, the Court holds that although an absolute governmental attorney-client privilege applies to civil cases in which government attorneys represent government agencies or government employees, only a qualified governmental attorney-client privilege applies to a subpoena issued by a federal grand jury. The Court further

holds that this privilege can be overcome if the subpoena proponent can show "first, that each discrete group of the subpoenaed materials [or testimony] likely contains important evidence; and second that this evidence is not available with due diligence elsewhere." Id. at 754.   If the Court finds a sufficient showing of need, the Court shall order compliance with the subpoena subject to the relevancy standard established by R. Enterprises, 498 U.S. at 300.   See In re Sealed Case, 121 F.3d at 759.

### 5.   Application of the Court's Holdings to the Subpoenaed Testimony

The Court directed the OIC to inform the Court as to its need for the testimony withheld by Lindsey on the basis of the governmental attorney-client privilege.   The OIC provided the Court with a substantial ex parte submission that the Court has reviewed in camera.   This submission incorporates by reference the substance of the OIC's ex parte submission demonstrating its need for conversations covered by the executive privilege because Lindsey often asserted both the governmental attorney-client privilege and the executive privilege with respect to the same subpoenaed communications.   The "need" submission regarding the governmental attorney-client privilege identifies fourteen categories of information sought from Lindsey and explains how each category meets the In re Sealed Case two-prong need standard.

The Court's finding of need cannot be detailed because the submission was reviewed in camera and involves matters subject to Federal Rule of Criminal Procedure 6(e)(2).   See id. at 740.   [REDACTED]   The Court cannot describe the categories in any more detail without revealing "matters occurring before the grand jury."   See Federal Rule of Criminal Procedure 6(e)(2).

The Court finds that all fourteen categories are "likely" to contain evidence that is

30

"important" and relevant to the grand jury's investigation. In re Sealed Case, 121 F.3d at 754.

As the Court explained before, if there were instructions from the President to obstruct justice or

suborn perjury, they were likely communicated to his closest advisors, such as Lindsey, in

conversations unlikely to have been recorded on paper. If the White House interviewed grand

jury witnesses in order to determine how and whether the President or his aides could avoid

compliance with grand jury subpoenas or otherwise obstruct the investigation, then the

witnesses' identities and the substance of those interviews would shed light on this. Similarly, if

the President disclosed to his closest legal advisor that he committed crimes of perjury or

obstruction of justice, he likely made the disclosure in a conversation, not in writing. Because

"the content" of the conversations covered by the governmental attorney-client privilege likely

contains important and relevant evidence to the crimes under investigation, the grand jury's need

for those conversations is as "undeniable" as it is for communications protected by the executive

privilege. Id. at 761 (citation omitted).

The OIC has shown with sufficient specificity that the subpoenaed testimony from

Lindsey is not available with due diligence elsewhere. See id. at 754. The D.C. Circuit has

stated that "when . . . an immediate White House advisor is being investigated for criminal

behavior[,] . . . the subpoena proponent will be able easily to explain why there is no equivalent

to evidence likely contained in the subpoenaed materials." Id. at 755. [REDACTED] The ex

parte submission amply demonstrates the OIC's diligent but unsuccessful efforts to obtain this

evidence from sources other than Lindsey whenever it was possible.

The Court finds that the OIC's showing of need has overcome Lindsey's assertions of the

governmental attorney-client privilege. Accordingly, the Court orders Lindsey to comply with

the subpoena by answering the questions posed to him by the OIC and the grand jurors. If

Lindsey finds the questions do not meet the relevancy standard established by R. Enterprises, the

Court will be available to make this determination.

>      6.      The Common Interest Doctrine

Lindsey also asserts that conversations with the President's private attorneys that he held

in his official capacity as Deputy White House Counsel are protected under the common interest

doctrine. [REDACTED], the Court finds that the White House and the President as an individual

do not share sufficiently common interests in the grand jury investigation and the Paula Jones

case for the common interest doctrine to apply.

>      7.      The Governmental Work Product Doctrine

Lindsey has asserted that the work product doctrine protects subpoenaed testimony

regarding his interviews with grand jury witnesses and their attorneys. [REDACTED] Lindsey

has indicated that there are no work product documents. [REDACTED] The work product

doctrine provides qualified protection for an attorney's work product prepared in anticipation of

litigation. See Fed. R. Civ. P. 26(b)(3); Hickman v. Taylor, 329 U.S. 495 (1947).  The doctrine

applies in criminal cases, see United States v. Nobles, 422 U.S. 225, 239 (1975), and courts have

"uniformly held that the work product doctrine applies to grand jury proceedings." United States

v. Davis, 636 F.2d 1028, 1039 n.10 (5th Cir. 1981).  It is clear that a government party may

invoke the doctrine in civil cases. See NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 154

(1975).  Even if a governmental work product doctrine applies in the criminal context, the Court

finds that it does not apply to Lindsey's interviews because they were not in anticipation of an

adversarial proceeding.  Whenever the government invokes the doctrine, it bears the burden of

establishing its essential elements. See In re Grand Jury Subpoena, 112 F.3d at 925. One of the essential elements is that "the attorney was preparing for or anticipating some sort of adversarial proceeding involving his or her client." Id. at 924.

In the Eighth Circuit case involving Mrs. Clinton and the Whitewater investigation, the Court held that the work product doctrine did not apply to notes taken by a White House lawyer during a meeting involving Mrs. Clinton, her personal attorneys, and White House attorneys because the White House lawyer did not take the notes in "anticipation of litigation." Id. The Court rejected the White House's argument that the White House lawyer was preparing for the OIC's investigation because the OIC was investigating Mrs. Clinton as a private individual, not the White House. Id. Similarly, the Court rejected the White House's claim that its attorneys were anticipating litigation because they expected congressional hearings of employees at the White House and the institution itself. Id. The Court did not decide whether a congressional investigation constituted "an adversarial proceeding," but noted that even if it did, "the only harm that could come to the White House as a result of such an investigation is political harm" and that this did not meet the requirements of the work product doctrine. Id. at 924-25.

Like the Eighth Circuit, this Court holds that the work product doctrine does not apply to interviews with grand jury witnesses or their counsel conducted by White House attorneys, such as Lindsey, because they were not conducted in anticipation of litigation. Lindsey asserts that he conducted these interviews "for the purpose of providing legal and other advice to the witnesses," [REDACTED], and refers vaguely to "the ongoing grand jury investigation and potential Congressional proceedings," [REDACTED], but fails to explain why these proceedings constitute "litigation" for the White House. The Court finds that Lindsey and other White House

attorneys could not have been conducting the interviews in anticipation of an adversarial

proceeding because the OIC is not investigating the White House. In re Grand Jury Subpoena,

112 F.3d at 924. The White House is not involved in any adversarial proceeding. Neither the

OIC nor the Congress will be investigating the White House as an institution with respect to the

Lewinsky matter. Because the White House has failed to meet its burden of showing that

Lindsey's interviews were in anticipation of litigation, the work product doctrine does not apply

to those interviews.

## II. Conclusion

For the foregoing reasons, the Court will grant the motions of the Office of Independent

Counsel to compel the testimony of Bruce Lindsey and Sidney Blumenthal and will deny as moot

the motion to compel the testimony of [REDACTED]. An appropriate Order will issue on this

date.

NORMA HOLLOWAY JOHNSON
CHIEF JUDGE

Dated: May 26, 1998